# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT
## CASE NO. 24-11150

**Universal Protection Services, LLC,**
**d/b/a Allied Universal Security Services,**

**Petitioner/Cross-Respondent,**

**v.**

**National Labor Relations Board,**

**Respondent/Cross-Petitioner.**

---

**On Appeal for Review from Decision and Order in Universal Protection Services, LLC d/b/a Allied Universal Security Services, 373 NLRB No. 38, Case No. 12-CA-305972**

---

## PETITIONER/CROSS-RESPONDENT'S BRIEF

---

**MARTENSON, HASBROUCK & SIMON LLP**

Matthew D. Crawford
Georgia Bar No. 190109
Jennifer L. Pope (PHV)
Martenson Hasbrouck & Simon LLP
2573 Apple Valley Road NE
Atlanta, GA 30319
Tel: (404) 909-8101
mcrawford@martensonlaw.com
Jpope@martensonlaw.com

*Counsel for Petitioner/Cross-Respondent*
*Universal Protection Services, LLC d/b/a*
*Allied Universal Security Services*

## **CERTIFICATE OF INTERESTED PERSONS**

*No. 24-11150-J, Universal Protection Service, LLC v. National Labor Relations Board*

The undersigned counsel of record certifies that the following listed persons and entities as described in Federal Rule of Appellate Procedure 26.1 have an interest in the outcome of this case.

1. Allied Universal Holdco, LLC is a privately held parent company of Petitioner

2. Allied Universal Sideco, LLC is a privately held parent company of Petitioner

3. Allied Universal Topco, LLC is a privately held parent company of Petitioner

4. Brooks, Scott is Counsel for International Union, Security Police and Fire Professionals of America

5. Burdick, Ruth is Deputy Associate General Counsel, Appellate and Supreme Court Litigation Branch, for Respondent

6. Crawford, Matthew is Counsel for Petitioner

7. Emerson, Emily is Counsel for International Union, Security Police and Fire Professionals of America

8. Gregory Moore, Brooks and Clark, P.C. is Counsel for International Union, Security Police and Fire Professionals of America

9. International Union, Security Police and Fire Professionals of America

10. Meador, Bianca is Counsel for Petitioner

11. Martenson, Hasbrouck & Simon LLP is Counsel for Petitioner

12. National Labor Relations Board is the Respondent

13. Partners Group Holding AG ("PGPHF") is a publicly held corporation that owns 10% or more of Petitioner's stock

14. Pope, Jennifer is Counsel for Petitioner

15. Phillips, Dwayne is National Organizing Director, International Union, Security Police & Fire Professionals of America

16. Universal Protection Service, LLC d/b/a Allied Universal Security Services is a privately held corporation and the Petitioner

17. Universal Group Holdings LLC is a privately held parent company of Petitioner

18. USAGM Acquisition, LLC is a privately held parent company of Petitioner

19. Wendel SE ("WNDLF") is a publicly held corporation that owns 10% or more of Petitioner's stock

/s/ Matthew D. Crawford
Matthew D. Crawford

Counsel for Petitioner/Cross-Respondent
Universal Protection Services, LLC d/b/a
Allied Universal Security Services

## STATEMENT OF ORAL ARGUMENT

Allied Universal states that it believes oral argument would be helpful for framing the issue presented in this case, which as this brief demonstrates, concerns an unprecedented expansion of collective bargaining obligations for supervisory employees and substantial questions regarding the authority of the National Labor Relations Board.

## <u>TABLE OF CONTENTS</u>

**CERTIFICATE OF INTERESTED PERSONS**.................................................2

**STATEMENT OF ORAL ARGUMENT** ......................................................4

**TABLE OF CONTENTS** ...............................................................................5

**TABLE OF AUTHORITIES** .........................................................................7

**STATEMENT OF JURISDICTION** ............................................................9

**STATEMENT OF THE ISSUE** .....................................................................9

**STATEMENT OF THE CASE**......................................................................9

   **A.   Relevant Procedural History** .............................................................11

   **B.   Pertinent Facts** ...................................................................................12

      **1.   Allied Universal's Operations at Turkey Point Nuclear Plant**............12

      **2.   The Role of Lieutenants** ................................................................14

**SUMMARY OF THE ARGUMENT** ...........................................................20

**ARGUMENTS AND CITATIONS OF AUTHORITY** ...............................22

**I.   The Board's Autocratic Structure and Political Decision-Making Stands in Direct Conflict with The Seventh Amendment and Basic Principles of Due Process**...........................................................................................................22

**II.   Standard of Review**................................................................................25

   **A.   The Board's History On the Supervisory Question and Other Issues Demonstrates That It is Not Entitled To Deference** ....................................25

   **B.   Legal Determinations and Burdens of Proof**.......................................27

   **C.   Factual Determinations** .......................................................................28

**III.   The Court Should Not Enforce the Board's Determination that Lieutenants Are Not Supervisors Under the Act**..........................................30

   **A.   The Act's Definition of Supervisor** .....................................................30

   **B.   Lieutenants Exercise Discretion and Independent Judgment in the Issuance of Discipline** ..................................................................................32

**IV.   The Board's Cross-Petition for Enforcement Should be Denied** ........39

**CONCLUSION**............................................................................................39

**CERTIFICATE OF COMPLIANCE** ..................................................................41

**CERTIFICATE OF SERVICE** .........................................................................42

# TABLE OF AUTHORITIES

## *Cases*

*Axon Enter., Inc. v. FTC*, 598 U.S. 175, 198 (2023) .................................................22

*Cf. Transdev Services, Inc. v. NLRB,* 991 F. 3d 889, 899 (8th Cir. 2021) .............37

*Chamber of Com. of U.S. v. NLRB*, No. 6:23-CV-00553, 2024 WL 1203056,
at *4 (E.D. Tex. Mar. 18, 2024) ................................................................26

*Chevron U.S.A., Inc. v. NRDC,* 467, U.S. 837 (1984) ............................................26

*Empress Casino Joliet Corp. v. NLRB*, 204 F.3d 719 (7th Cir. 2000) ....................25

*Entergy Gulf States, Inc. v. NLRB*, 253 F.3d 203 (5th Cir. 2001) ...........................25

*GGNSC Springfield, LLC v. NLRB*, 721 F.3d 403 (6th Cir. 2013) ..........................25

*Goldberg v. Kelly*, 397 U.S. 254, 267, 90 S. Ct. 1011, 25 L.Ed.2d 287 (1970) ......24

*Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 42, 51 (1989) ..............................21

*Lakeland Health Care Associates, LLC v. NLRB*, 696 F.3d 1332 (11th Cir. 2012).25

*Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2261 (2024) ..................26

*McCain v. Fla. Power Corp.*, 593 So. 2d 500, 502 (Fla. 1992) ..............................22

*Multimedia KSDK, Inc. v. NLRB*, 303 F.3d 896 (8th Cir. 2002) ............................25

*NLRB v. Prime Energy Ltd. Partnership*, 244 F.3d 206 (3d Cir. 2000) ..................25

*NLRB v. Quinnipiac College*, 256 F.3d 68 (2d Cir. 2001) ......................................25

*NLRB v. Winnebago Television Corporation*, 75 F.3d 1208, 1214 (7th Cir. 1996) .25

*Northport Health Servs. v. NLRB¸* 961 F.2d 1547, 1550 (11th Cir. 1992)..............27

*Owens v. Wainwright*, 698 F.2d 1111, 1113 (11th Cir. 1983)..................................27

*Ridgewood Health Care Center, Inc. v. NLRB*, 8 F.4th 1263, 1275 (11th Cir. 2021)
.....................................................................................................................27

*Schnurmacher Nursing Home v. NLRB*, 214 F.3d 260, 266 (2d Cir. 2000) ...........36

*SEC v. Jarkesy,* 598 U.S. 1, No. 22-859, slip op. at 27 (June 27, 2024).................21

*Security Walls, LLC v. NLRB*, 80 F. 4th 1277, 1284 (11th Cir. 2023) ....................26

*Space Exploration Technologies Corp. et al. v. NLRB*, Case No. 6:24-cv-00203
(W.D. Tex. 2024).........................................................................................23

*State Farm Mut. Auto. Ins. Co. v. NLRB,* 411 F.2d, 356, 360 (7th Cir. 1969) .........24

*STP Nuclear Operating Co. v. NLRB*, 975 F.3d 507 (5th Cir. 2020)......................25

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) ...............................28

## *Statutes*

29 C.F.R. § 101.11(a) ................................................................22

29 C.F.R. §§ 101.10, 101.12 .....................................................21

29 U.S.C. § 152(11) ..................................................................29

29 U.S.C. §§ 158 ......................................................................21

## STATEMENT OF JURISDICTION

The National Labor Relations Board (the "Board" or "NLRB") exercised jurisdiction over the proceedings in Case No. 12-CA-305972, which in turn, affirmed the decision in Case No. 12-RC-286390. This Court has jurisdiction over this matter pursuant to Section 10(f) of the National Labor Relations Act because the Board's Decision and Order in Case No. 12-CA-305972 is a "final order" and Allied Universal is a party aggrieved by that final order.

The purported unfair labor practice violations are alleged to have occurred in Florida City, Florida, within the territorial jurisdiction of this Court.

Allied Universal timely filed its Petition for Review on April 12, 2024 (Case No. 24-11150). The Board filed a Cross-Application for Enforcement on May 1, 2024.

## STATEMENT OF THE ISSUE

Whether the NLRB properly determined that Allied Universal's lieutenants assigned to its Turkey Point account were supervisors under § 2(11) of the National Labor Relations Act such that Allied Universal had an obligation to collectively bargain with them over the terms and conditions of their employment?

## STATEMENT OF THE CASE

This case is about whether the Lieutenants who work for Allied Universal in a supervisory capacity at Turkey Point nuclear power generating facility in Florida

City, Florida ("Turkey Point") are properly considered "supervisors" under the National Labor Relations Act (the "Act"). In a hearing held before a representative of the Regional Director of Region 12 of the National Labor Relations Board ("Board") – a non-adversarial hearing at which the relevant decision-maker was not even present – Allied Universal demonstrated that the Lieutenants in question had the authority to hire employees, assign work to employees, discipline employees, and direct their work. Especially with respect to the issuance of discipline, the record is replete with specific instances in which Lieutenants exercised their own discretion and independent judgment in the exercise of these tasks. They did so with minimal oversight from higher-ups; while written guidance regarding discipline did exist, the Lieutenants admitted they were free to ignore this guidance when appropriate. Despite this evidence, the Regional Director determined that the Lieutenants were not supervisors under the Act.

After this matter worked its way through the various applicable procedural steps, the Board ultimately agreed with that determination, issuing an order requiring Allied Universal to bargain with the union claiming to represent the Lieutenants. In addition to relying upon the Regional Director's misapplication of the law and ignoring of the record evidence, the Board issued this determination without the benefit of the due process to which Allied Universal is constitutionally entitled.

### A. Relevant Procedural History

On November 16, 2021, the Security Police and Fire Professionals of America (the "Union") filed a Petition seeking representation of "all full-time and regular part-time armed and unarmed supervisors and lieutenants performing guard duties as defined in Section 9(b)(3) of the National Labor Relations Act employed by Allied Universal at Turkey Point Nuclear Power Plant in Florida City, Florida", excluding "all office clerical employees, professional employees and supervisors as defined by the Act." [Vol. III, Doc. 17-4, pg. 2].

Following a hearing conducted by a Field Agent, the Regional Director of Region 12 – who did not attend the hearing and was in no position to evaluate the credibility of witnesses – determined that the petitioned-for unit of employees were not supervisors under Section 2(11) of the Act and ordered a mail-ballot election. [Vol. III, Doc. 17-4, pg. 41]. Ballots were sent to eligible voters beginning on August 3, 2022. [Vol. III, Doc. 17-4, pgs. 63-65]. On August 31, 2022, the Region conducted the ballot count, and a majority of votes were cast in favor of the Union. [Vol. III, Doc. 17-4, pg. 67]. Over Allied Universal's timely filed objections, the Board issued a Decision on Objections and Certification of Representative affirming the decision on October 11, 2022. [Vol. III, Doc. 17-4, pgs. 68-70; pgs. 89-91]

On October 25, 2022, the Union filed a Charge alleging Allied Universal violated Section 8(a)(5) and (1) of the Act by refusing to recognize and bargain with the

Union following certification, followed by a complaint issued by the General Counsel on December 19, 2023. [Vol. III, Doc. 17-5, pgs. 2-10].

On January 24, 2024, the General Counsel filed a Motion for Summary Judgment and on February 14, 2024, Allied Universal timely filed a Response in Opposition. [Vol. III, Doc. 17-5, pgs. 16-24; pgs. 212-214]. Rather than provide Allied Universal an adversarial hearing on the merits in front of an Administrative Law Judge, much less the full jury trial to which it is constitutionally entitled, a three-member panel of the Board granted the General Counsel's Motion for Summary Judgment on March 27, 2024. [Vol. III, Doc. 17-5, pgs. 215- 218]. In that Decision and Order, the Board required Allied Universal to recognize and bargain with the Union and recognize "all full-time and regular part-time armed and unarmed supervisors/lieutenants employed by [Allied Universal] at Turkey Point Nuclear Power Plant in Florida City, Florida…" as part of the bargaining unit, among other remedies. [Vol. III, Doc. 17-5, pg. 218].

## B.    Pertinent Facts

### 1.    Allied Universal's Operations at Turkey Point Nuclear Plant

Allied Universal provides security services at the Turkey Point facility. Turkey Point Plant is a commercial nuclear generating facility that generates power; Allied Universal's guards are responsible for securing the facility. Allied Universal has

approximately 208 employees at the Turkey Point Plant. Of these employees, approximately 24 are "Lieutenants." [Vol. III, Doc. 17-4, pgs. 25-26].

The highest level of Allied Universal employee at the Turkey Point Plant is the Project Manager who responsible for overseeing the security force, which includes performing a variety of administrative functions as well as overseeing all training and operations sections. [Vol. III, Doc. 17-4, pg. 73]. Day-to-day oversight of security operations falls to the Security Operations Coordinator, who oversees the daily operations team which consists of two layers of supervision – Captains and Lieutenants –and the security officers themselves. [Vol. III, Doc. 17-4, pgs. 73-74].

Lieutenants provide the most direct layer of oversight of the security officers. [Vol. III, Doc. 17-4, pg. 74]. Lieutenants oversee five to six security officers at a time. [Vol. III, Doc. 17-4, pg. 74]. As part of their daily duties, Lieutenants are responsible for conducting post inspections, making sure that security officers are performing their jobs properly, addressing conduct and performance issues among security officers and conducting performance evaluations of security officers. Lieutenants are the boots on the ground regarding interaction with and discipline of the security officers. [Vol. III, Doc. 17-4, pg. 74].

As their job description states, Lieutenants' main job duties and functions include providing supervision and work direction for security officers. [Vol. III, Doc. 17-4, pg. 74, citing Employer Exhibit 2 at 2]. Their written job description and

job posting makes clear that the issuance of discipline is a specific and essential function of a Lieutenant's daily job duties. A Lieutenant "supervises, observes, and evaluates the job performance of security officers and/or sergeants… conducts post inspections… provides training, coaching, and mentoring for Security Officers and/or Sergeants…provides counseling and discipline for identified deficiencies in security officer and/or sergeant performance…assists with hiring, promotion, and termination processes as appropriate". [Vol. III, Doc. 17-4, pgs. 74-75].

### 2. The Role of Lieutenants

#### a. Monitoring Security Officers' Work Performance and Compliance With Applicable Rules

A Lieutenant's main responsibility during his or her shift is to supervise the security officers within the area of his or her responsibility. All Lieutenants are qualified to serve in various roles at the Turkey Point Plant and rotate through the positions on a regular basis. [Vol. III, Doc. 17-4, pg. 75]. Lieutenants are responsible for ensuring that the security officers who work under them follow the Company's work rules and perform their jobs properly. [Vol. III, Doc. 17-4, pg. 74]. One of the most important elements of this responsibility is the performance of post inspections, the purpose of which is to ensure that officers are performing their jobs properly. [Vol. III, Doc. 17-4, pg. 76]. If a Lieutenant observes an officer not performing his job properly, the Lieutenant must take action. [Vol. III, Doc. 17-4, pg. 98].

Lieutenants are also called upon to investigate and address work rule violations and misconduct that they do not witness directly. The evidence presented at the hearing was clear that it is Lieutenants were called upon to investigate allegations of wrongdoing reported by third parties that the Lieutenant did not personally witness. [Vol. III, Doc. 17-4, pg. 104]. This process involves numerous steps, all of which involve the extensive exercise of discretion and independent judgment, including identifying and speaking with potential witnesses, weighing potentially conflicting information, and determining whether a particular work rule or standard has been violated. [Vol. III, Doc. 17-4, pg. 105].

### b.     Addressing Poor Performance and Work Rule Violations

Of course, identifying situations in which a security officer has done his job poorly or violated an applicable work rule is only the first step in a Lieutenant's supervisory role. The Lieutenant must also determine the appropriate steps to correct the problem and ensure that it does not recur. [ Vol. III, Doc. 17-4, pg. 123]. Available options include an informal, undocumented counseling; a documented counseling; formal discipline; or a recommendation to the Captain that the security officer be suspended or terminated. Determining which of these steps is appropriate in a given situation is made on a case-by-case basis by the Lieutenants. [Vol. III, Doc. 17-4, pgs. 125-128]. Indeed, the record in this case contains over forty examples of non-

attendance related disciplines issued by Lieutenants, primarily within the 12 months prior to the Hearing.[1] [Vol. III, Doc. 17-4, pg. 111, citing Employer Exhibits 7-52].

The unrebutted testimony of the Project Manager was clear on this point:

> Q. If a Lieutenant is conducting a post-inspection and forms the conclusion that a Security Officer is not -- to use one of the examples you gave is not alert. What tools does the Lieutenant have available to address that lack of alertness of the Security Officer?
> A. The Lieutenant has the ability to relieve the Security Officer from that post if they are not alert and attentive.
> Q. Are there other steps a Lieutenant take short of relieving the Officer from post if they're not being alert?
> A. Yes, the Lieutenant could see the Officer in the post, or spend time with them in the post, encourage the Officer to get up, move around, maybe have some coffee, do something to increase they're level of alertness. Maybe have some discussion with them to ensure they're awake and alert.
> Q. Is there anything else that a Lieutenant could do if during a post-inspection for example, he determined that the Security Officer were not alert?
> A. The Lieutenant may potentially issue discipline for that.

[Vol. III, Doc. 17-4, pg. 124, citing Transcript at 35-37].

The Lieutenants themselves corroborated this testimony, reiterating that the decision as to what action to take in response to an observed violation of a work rule or poor performance is up to the Lieutenant. For example, Lieutenant David Gonzales testified as follows as it relates to post inspections:

> Q. Okay. How do you decide whether a certain issue that you witness, let's say you do a post-inspection and there you -- whatever example

---

[1] The record does not contain a single instance of a discipline issued to a security officer by anyone other than a Lieutenant.

you want to think of you witness a problem with the way an Officer is doing his or her job, something that they need to improve or do better? How do you decide whether to issue coaching, or discipline?

A. Depending on the severity of the issue obviously. And, depending on what I come up with if I have to investigate the issue.

Q. And when you dependent upon the severity of the infraction, or the severity of the situation. That's a determination that you're called upon to make. Correct? Whether the violation is sufficiently severe to warrant discipline versus merely a coaching?

A. That's correct I go by the guidelines given to me in the discipline policy front reader (ph.)

Q. Okay, where in these guidelines to tell you where to draw the line between something that's coaching appropriate and something that's discipline appropriate?

A. It does not tell you in the policy.

Q. So it's up to your discretion. Right?

A. That's correct.

Q. Two different Lieutenants dealing with the same situation reach different conclusions as to whether coaching was appropriate as to discipline being appropriate.

A. That's correct.

[Vol. III, Doc. 17-4, pgs. 124-125, citing Transcript at 140-141].

Lieutenant Jaisson Correa corroborated this testimony:

Q. Explain to me the difference between a coaching and a discipline.

A. A coaching could be something as simple as if you don't use -- you don't have your hand, you're not using the rails going up the stairs on the stairs can be coaching as simple as hey make sure you're using, you have your hand on the rail going down the stairs or going up the stairs. That's got to be a coaching and you also have a written coaching which is like a documented coaching which is pretty much in case you want to make it official because this isn't their first time for somebody. You keep telling that person: Hey I'm, this is my second time I've told you already, now you want make it and put into records that's when you go for a documented coaching. That way you could have a record in case something happens later on and like I said, if you catch this officer

again you can do a disciplinary action which is now, you're at your level 3 which would be a verbal warning.

Q. Have you issued in role as Lieutenant at Turkey Point, have you issued both documented coaching and written discipline?

A. Yes, ma'am I have done both.

Q. How do you know which one to give?

A. It depends on the severity of the case. You know like a coaching, if it's something serious I'm not going to give that officer a coaching. You're not going to officer a coaching say he is missing a round on his magazine. That's not a coaching. That's-- you actually got to go into procedure and there's a location for that. But, like I said, a coaching could be simple as say if they don't use, if they don't have a lanyard attached that you give issue a coaching for that. Because that's our expectations, make sure every officer that has a rifle they have a lanyard attached to themselves.

Q. Can one Lieutenant decide to issue a coaching in one situation and another Lieutenant in another situation decide to give a documented coaching or written discipline?

A. You could go with a -- you could issue a coaching, there's nothing wrong with that. You could also issue -- also there's a documented coaching, also if you want-- it depends on the Lieutenant. Sometimes you could be something like hey, let's say you witness the lanyard coming out and you coach him real quick because you witness it coming out. But he had it on him so you're not going to write it down because you saw what happened. Well, a coach -- let's say he's walking around, or let's say you go into a support -- the support room and they don't have their lanyards attached then from there you will issue a coaching, or documented coaching. Because they know the expectations when you're in the support always have your weapon attached even if it's on a rack. Written discipline, like I said, another Lieutenant, I can't speak for other Lieutenants, but it depends on the officer, how many cases, how many times he's been in trouble for the same thing. That could happen, too. They could issue a written discipline if they want to take that route.

Q. Who makes the decision on what type of coaching or what type of discipline to give?

A. It basically goes on procedure. So, like for example like I said a coaching. We catch something as a supervisor you rather coach that person. You rather go on a coaching reason being because then it could fall on you because then the first thing that management will do if

management finds it, they'll be like who's your field supervisor? And
you know -- or let's say if you're in the same room how come you didn't
catch the lanyard, how come it takes me coming to walk in to find us
without lanyards so then it becomes a bigger deal.

Q. So, I want to make sure I understand you right. You're saying you
as the Lieutenant can decide to issue a coaching?

A. Yes, ma'am.

Q. And you as a Lieutenant can decide to issue a written discipline?

A. Yes, ma'am…

[Vol. III, Doc. 17-4, pgs. 102-103, citing Transcript 214-217].

### c. Lieutenants' Issuance of Discipline for Officers' Performance Deficiencies and Work Rule Violations Did Not Require Input From Higher-Level Managers

Moreover, absent unusual and rare circumstances, the involvement of any

higher-level supervisors or management in the process of performance management

and discipline of security officers is minimal. [Vol. III, Doc. 17-4, pg. 127]. A

Lieutenant does not have to receive permission from a Captain or other manager for

meeting with a Security Officer to issue a Disciplinary Action Form nor does the

Lieutenant need to have anyone present when a Disciplinary Action Form is issued

to a Security Officer. [Vol. III, Doc. 17-4, pgs. 127-128]. Captains and other

managers do not review disciplinary action forms before they are issued to officers.

[Vol. III, Doc. 17-4, pg. 128]. No additional investigation is conducted before the

discipline issued by Lieutenants are placed in employees' personnel files. [Vol. III,

Doc. 17-4, pg. 128, citing Transcript at 41-42, 185, 187]. Rather, the Captain might

perform the entirely ministerial function of receiving the disciplinary action form

and passing it on to Human Resources for filing. [Vol. III, Doc. 17-4, pg. 128, citing Transcript at 42, 50, 74, 181-187]. Once in an employees' file, the discipline becomes a step in a progressive discipline policy that can ultimately result in termination of employment. [Vol. III, Doc. 17-4, pg. 128, citing Transcript at 57, 102-103, 123-124]. The Regional Director acknowledged as much: "Lieutenants may independently investigate and administer oral and written warnings for lower-level misconduct without seeking permission and without making a recommendation to anyone higher in the chain of command." [Vol. III, Doc. 17-4, pg. 100, citing Regional Director's Decision at 8].  Further, "Lieutenant's review the security officer's disciplinary history, decide the level of discipline (if any), and issue oral and written warning notices independently, without obtaining any superior's input." [Vol. III, Doc. 17-4, pg. 100, citing Regional Director's Decision at 8].

## SUMMARY OF THE ARGUMENT

The evidence in this case is clear that the Turkey Point Lieutenants are supervisors under the Act. They are the primary drivers of the disciplinary process, one of the enumerated functions of a supervisor under Section 2(11). And they exercise discretion and independent judgment in doing so. The Regional Director's and the Board's determination that they do not is not supported by substantial evidence and is entitled to no deference. The Lieutenants themselves testified that *they* determine whether a work rule violation has occurred; *they* determine whether the work rule violation is best addressed via formal discipline or informal

20

counseling; and *they* determine what level discipline is appropriate. They can make these determinations even when their conclusions differ from the applicable written policies. Longstanding Board and Court of Appeal precedent holds that employees who exercise this level of discretion of undoubtedly supervisors.

That the Lieutenants are supervisors under Section 2(11) is the inescapable conclusion regardless of what standard of review and deference this Court applies to the Board's determinations. However, to the extent the Court deems it necessary, the level of deference historically accorded to the Board's determinations should not be extended here. First, the deference extended by this Court has never applied to situations where the Board ignores record evidence and makes unsupportable leaps of logic and reasoning. Moreover, recent legal developments from the Supreme Court as well as the Board's record when it comes to making determinations as to whether a particular class of employees qualify as "supervisors" under the Act make clear that the deference that has been historically given the Board should no longer apply.

## ARGUMENTS AND CITATIONS OF AUTHORITY

**I.    The Board's Autocratic Structure and Political Decision-Making Stands in Direct Conflict with The Seventh Amendment and Basic Principles of Due Process.**

As a threshold matter, the Board's Order should not be enforced because it was issued in violation of Allied Universal's Seventh Amendment and due process rights. An administrative agency violates the Seventh Amendment when it plays "the roles of prosecutor, judge, and jury". *SEC v. Jarkesy,* 598 U.S. 1, No. 22-859, slip op. at 27 (June 27, 2024). As it stands, the Board's structure represents an unconstitutional usurpation of power and deprives companies like Allied Universal of their due process rights. The Seventh Amendment guarantees access to a jury in all "suits at common law". U.S. Const. amend. VII. There are three features of "suits at common law" all of which are present in the Board's proceedings: (1) they mirror common law claims; (2) they award traditional legal remedies; and (3) they affect private rights. *See Jarkesy (Jarkesy II)*, No. 22-451, slip op. at 7–8; *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 42, 51 (1989).

One of the Board's key functions is processing unfair labor practice charges, which it does exclusively through an administrative process. *See* 29 U.S.C. §§ 158, 160(a)-(b). Unfair labor practice charges are supposed to be adjudicated by an administrative law judge, subject to review by the full Board. 29 C.F.R. §§ 101.10, 101.12.  Significantly, the typical factfinder is an administrative official—never a

jury. *See* 29 C.F.R. § 101.11(a). Unfair labor practice charges are fundamentally indistinguishable to suits at common law and as such, the Board's structure violates the Seventh Amendment. *First*, the Board processes "suits at common law" when it processes modern unfair labor practice charges. For instance, common law claims of tortious interference parallel the unfair labor practice of coercing a person to either join, or not join a union. *See* 29 U.S.C. § 158(a)(1). *Second*, the Board has the authority to award traditional legal remedies in a myriad of ways. By way of example, the Board has the authority to award pecuniary costs that foreseeably result from an unfair labor practice, which parallel consequential damages under common law in that they are recoverable when they are foreseeably traceable to the wrongful act. *McCain v. Fla. Power Corp.*, 593 So. 2d 500, 502 (Fla. 1992) (consequential damages are available when the conduct foreseeably caused the injury). *Third*, and perhaps most importantly, the Board awards remedies that affect core private rights of life, liberty and property rights. *See Jarkesy II*, No. 22-451, slip op. at 1 (Gorsuch, J., concurring); *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 198 (2023) (Thomas, J., concurring). For example, employers are prohibited from negotiating non-disparagement and confidentiality provisions in settlement or severance agreements and are required to grant unions access to their private property. *McLaren McComb*, 372 N.L.R.B. No. 58, 2023 WL 2158775, at *1 (Feb. 21, 2023); *Bexar Cnty.*

*Performing Arts Ctr. Found*., 372 N.L.R.B. No. 28, 2022 WL 18107715, at *1 (Dec. 16, 2022).

Applying this analysis and the Court's ruling in *Jarkesy* to the present action demonstrates that the Board violated the due process rights of Allied Universal when it denied Allied Universal the ability to have its case heard outside the confines of the Board's administrative system, much less by a jury of its peers. The Supreme Court's rulings in *Loper Bright* and *Jarkesy* establish that the Board is no longer afforded the privilege of deference for its substantive decisions and that its structure violates due process. Notably, a flurry of recent lawsuits assert that the Board's structure is unconstitutional, and two Texas federal judges recently blocked the Board on the same constitutional grounds. Most notably, SpaceX and Energy Transfer LP, have each argued that the Board's structure violates the Constitution based on the logic in *Jarkesy*. *See generally, Space Exploration Technologies Corp. et al. v. NLRB*, Case No. 6:24-cv-00203 (W.D. Tex. 2024); *Energy Transfer, LP et al., NLRB*, Case No. 3:24-cv-198 (S.D. Tex. 2024). While the *Jarkesy* rationale has not yet been adopted in this Circuit, the logic is the same and demonstrates that it is becoming increasingly accepted that structure of the Board in acting as the "prosecutor, judge and jury" presents a violation of due process rights. Regrettably, this procedural depravation is combined with the absence of a neutral dispute resolution system that applies merit-based decision-making.

Even if the Seventh Amendment does not apply directly, the Board's processes in this case raise significant due process concerns. As discussed below, no one involved in the Board's decision-making process heard any live testimony or was in a position to make appropriate credibility determinations. This is a fundamental deprivation of due process. "The fundamental requisite of due process of law is the opportunity to be heard" at "a meaningful time and in a meaningful manner." *Goldberg v. Kelly*, 397 U.S. 254, 267, 90 S. Ct. 1011, 25 L.Ed.2d 287 (1970). "[R]epresentation cases, unlike unfair labor practice cases, are not adversarial in nature but are fact-finding hearings." *Springfield Terrace,* 355 NLRB 937, 940 (2010). A representation hearing "is designed primarily to enable the Board to fulfill its statutory function with respect to the certification of bargaining representatives." *State Farm Mut. Auto. Ins. Co. v. NLRB,* 411 F.2d, 356, 360 (7th Cir. 1969). Allied Universal raised this issue in opposition to the General Counsel's Motion for Summary Judgment, but the Board gave it no consideration.

## II.    Standard of Review

### A.    The Board's History On the Supervisory Question and Other Issues Demonstrates That It is Not Entitled To Deference

A threshold question in a review of an administrative agency's determination is what level of deference the agency is entitled to. "An administrative agency, like any other first-line tribunal earns – or forfeits – deferential judicial review by its performance." *NLRB v. Winnebago Television Corporation*, 75 F.3d 1208, 1214 (7th

Cir. 1996). On the question of its ability to accurately determine whether particular classes of employees qualify as supervisors under the Act, the NLRB's record is mixed, at best.  *See, e.g., STP Nuclear Operating Co. v. NLRB*, 975 F.3d 507 (5th Cir. 2020) (holding that Board's determination that employees were not supervisors was not supported by substantial evidence); *GGNSC Springfield, LLC v. NLRB*, 721 F.3d 403 (6th Cir. 2013) (same); *Lakeland Health Care Associates, LLC v. NLRB*, 696 F.3d 1332 (11th Cir. 2012);  *Entergy Gulf States, Inc. v. NLRB*, 253 F.3d 203 (5th Cir. 2001) (same); *Empress Casino Joliet Corp. v. NLRB*, 204 F.3d 719 (7th Cir. 2000) (same); *NLRB v. Prime Energy Ltd. Partnership*, 244 F.3d 206 (3d Cir. 2000) (same); *Multimedia KSDK, Inc. v. NLRB*, 303 F.3d 896 (8th Cir. 2002) (same) ; *NLRB v. Quinnipiac College*, 256 F.3d 68 (2d Cir. 2001).

On myriad other issues, the Board's record reflects that it is less an unbiased agency engaging in a neutral application and interpretation of the National Labor Relations Act, and more a political entity subject to the vagaries of electoral politics. *Compare, e.g., Stericycle, Inc*., 372 NLRB No. 113 (2023) with *Boeing Company*, 365 NLRB No. 154 (2017), *with Lutheran Heritage Village-Livonia* (343 NLRB 646 (2004) (imposing radically different standards for whether employer work rules violate the Act); *E.I. DuPont de Nemours*, 364 NLRB, No. 113 (2016) with *Raytheon Network Centric Systems*, 365 NLRB No. 161, 16 (2017) with *Wendt Corp.*, 372 NLRB No. 135 (2023) (imposing radically different standards for bargaining

obligations relating to past practices); *see also Chamber of Com. of U.S. v. NLRB*, No. 6:23-CV-00553, 2024 WL 1203056, at *4 (E.D. Tex. Mar. 18, 2024) (noting that the Board has changed its "joint employer standard four times in just ten years")*; See also Amy Semet, Political Decision-Making at the National Labor Relations Board; An Empirical Examination of the Board's Unfair Labor Practice Decisions through the Clinton and Bush II Years*, 37 Berkley J. Emp. & Lab. L. 223,227 (2016).

### B. Legal Determinations and Burdens of Proof.

The Board's legal conclusions are subject to *de novo* review. *Security Walls, LLC v. NLRB*, 80 F. 4th 1277, 1284 (11th Cir. 2023). While the *Security Walls* court noted that, under *Chevron U.S.A., Inc. v. NRDC,* 467, U.S. 837 (1984), this Court owed "deference" to the Board's construction of the National Labor Relations Act, that deference should no longer be applied. *See Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2261 (2024) (overruling *Chevron* and holding that "courts decide legal questions by applying their own judgment").

Acting in part under *Chevron's* cover of deference, the Board has developed various interpretations of the Act that inappropriately tilt the scales in favor of findings that employees are not supervisors under the Act. For example, the Board requires employers to bear the burden of proof of proving that certain employees are not supervisors, *Oakwood Healthcare, Inc.*, 348 NLRB 686, 687 (2006); and that conflicting record evidence must always be interpreted so as to preclude a finding of

27

supervisory status, *The Arc of South Norfolk*, 368 NLRB No. 32 (2019). None of these rules, however, have any basis in the text of the Act and this Court should not apply them.

### C.    Factual Determinations.

To the extent the Board's determination that Lieutenants are not supervisors is based on factual determinations, Courts of Appeal have traditionally upheld those determinations if they are supported by "substantial evidence" – that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Ridgewood Health Care Center, Inc. v. NLRB*, 8 F.4th 1263, 1275 (11th Cir. 2021) (quoting *Northport Health Servs. v. NLRB¸* 961 F.2d 1547, 1550 (11th Cir. 1992).

However, the courts' deference to an agency's factual determinations are based at least in part on the inherent difficulties on making factual determinations from a "cold record." *Owens v. Wainwright*, 698 F.2d 1111, 1113 (11th Cir. 1983). Here, however, none of the factual determinations at issue were made by anyone who actually viewed live testimony. The hearing on Allied Universal's objections was conducted by a regional board agent, with the ultimate determination as to supervisory status being made by the Regional Director *who was not even present at the hearing*. This decision was affirmed by the full Board, who were themselves acting on a cold record. [Vol. III, Doc. 17-5, pgs. 215-218].

After Allied Universal declined to bargain with the improperly-certified Union, an unfair labor practice complaint was filed, and the Regional Director moved for summary judgment. [Vol. III, Doc. 17-5, pgs. 3-10; 16-24]. Allied Universal opposed that motion, in part on grounds that it had not been able to introduce its evidence in a full adversarial proceeding in which the fact-finder would be able to evaluate live testimony. [Vol. III, Doc. 17-5, pgs. 212-214]. The Board denied that request and granted summary judgment. [Vol. III, Doc. 17-5, pgs. 215-218]. In short, there is no actual fact-finding, as that term is generally understood in American jurisprudence, to which to defer here. And there is no reason for this Court not to review the record in the same way that the NLRB's fact-finders did.

Even if this Court were to apply traditional deference principles to the Board's "fact finding", that standard has limits. Courts are required to "consider the whole record," including "whatever in the record fairly detracts" from the Board's findings. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). Where the Board has ignored a portion of the record, the Board's decision is subject to reversal. *STP*, 975 F.3d at 513.

This Court is also empowered to delve into the soundness of the Board's reasoning in reaching its factual conclusion. As recently explained:

> [T]his deferential [reasonable basis] standard is not merely a rubber stamp on agency decisionmaking. The Board's decision must be logical, rational, and based on facts that are supported by the record.

We will not enforce a Board decision that fails to engage in reasoned decisionmaking.

*Security Walls*, 80 F.4th at 1285 (internal citations and quotations omitted); *see also*

*Ridgewood Health Care*, 8 F.4th at 1275 ("We will not enforce a Board decision that

based its decision on facts that are not supported by the record or misconstrued or

failed to consider important evidence.") (internal quotations and alterations omitted).

## III. The Court Should Not Enforce the Board's Determination that Lieutenants Are Not Supervisors Under the Act.

Regardless of the standard review that is applied, the Board erred when it

determined that the Turkey Point Lieutenants are not supervisors under the Act. In

making this determination, the Board ignored record evidence and its own

precedents.

### A. The Act's Definition of Supervisor.

The Act defines "supervisor" as follows:

Any individual having the authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing, the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11).

The authority to perform even one of these tasks is sufficient to make a class

of individuals "supervisors" and therefore excluded from the definition of

"employee" under the Act. *In re Progressive Transportation Services, Inc*., 340 NLRB 1044, 1045 (2003). ("The possession of *any* of of the[se] indicia . . . is sufficient to confer supervisory status, as long as the authority is carried out in the interest of the employer and requires the exercise of independent judgment.") (emphasis added). Moreover, the possession of authority to engage in any of the listed statutory functions—even if this authority has not yet been exercised—is sufficient to establish supervisory status. *Wal-Mart Stores*, 340 NLRB  220, 223 (2003); *Fred Meyer Alaska, Inc.*, 334 NLRB 646, 649 Fn.8 (2001); *PepsiCola Co.*, 327 NLRB 1062, 1063 (1991).

The exclusion of supervisors from the Act reflects an important policy judgment by Congress. While recognizing the importance of collective bargaining, Congress also recognized the importance of maintaining an employer's ability to effectively manage its workforce. This ability requires the existence of supervisors – that is, individuals who can effectuate and enforce the employer's work rules and performance expectations without fear of divided loyalties. *See, e.g*., *Winnebago Television Corp.*, 75 F.3d at 1213-14) ("Allowing supervisors to join employee unions would threaten the integrity of a business's decision-making hierarchy and would create potential conflicts of interest as supervisors balanced their loyalties to the union with those to their employer.").

**B.    Lieutenants Exercise Discretion and Independent Judgment in the Issuance of Discipline.**

It cannot reasonably be disputed that Lieutenants issue discipline. The record before the Board included more than *forty* examples of discipline, most issued in the twelve-month period before the hearing. [Vol. III, Doc. 17-4, pgs. 34-36]. Rather, the Board seems to have concluded that Lieutenants did not exercise discretion and independent judgment in the issuance of discipline. This conclusion appears based on the Board's determination that disciplines were governed by the "mechanistic application of the detailed Policy 1308, including the grid specifying the discipline level of infractions and the steps of the progressive disciplinary policy" and that Lieutenants were sometimes second-guessed or were subject to review by Captains for the manner in which they issued (or did not issue) discipline. [Vol. III, Doc. 17-4, pgs. 56-58] The Board's conclusions ignores both the evidence in the record and applicable law.

**1.    The Decision of Whether to Issue Discipline is Fundamentally Discretionary.**

As discussed above, the record is replete with testimonial and documentary evidence that the issuance of discipline is only one of several options a Lieutenant has when faced with a situation in which an officer has committed a work rule violation or not done his job properly. [Vol. III, Doc. 17-4, pg. 38]. Lieutenants also have the option of conducting a completely informal verbal counseling or issuing a

non-disciplinary written counseling statement. Lieutenants admitted that there were no documents that told them which course to follow, and that different Lieutenants could reach different conclusions as to which course of action to follow. [Vol. III, Doc. 17-4, pgs. 76-80].

The Board's own precedents recognize that "discretion is inherent – and perhaps unavoidable – in many kinds of discipline." *Alan Ritchey, Inc.*, 359 NLRB No. 40 (2012); *Progressive Transportation*, 340 NLRB at 1046 (holding that employee was a supervisor where the employee has "authority to decide whether to handle potential discipline issues herself informally" and "simply tell the employee to stop the offending behavior" rather than recommending formal discipline). As the Board noted in *Berthold Nursing Care Center, Inc.*, 351 NLRB 27, 29 (2007):

> [T]he [supervisors] here have the discretion to document employee infractions on the counseling forms. In this respect, the [supervisors] alone decide whether the conduct warrants a verbal warning or written documentation. Because the [supervisors] here have the discretion to write-up infractions on employee counseling forms, we believe that they are vested with the authority to exercise independent judgment in deciding whether to initiate the progressive disciplinary process against the employee.

Courts of Appeal have also recognized this principle. *See, e.g., Lakeland Health Care Associates, LLC,* 696 F.3d at 1340 (relying, in part, on "unrebutted testimony establish[ing] that . . . LPN's possess the discretionary authority to determine *whether formal discipline is warranted in the first place*" to deny enforcement of NLRB order that LPN's were not supervisors); *GGNSC Springfield*

*LLC,* 721 F. 3d at 409 ("[B]ecause RN's exercise independent judgment in choosing *whether* to issue a memoranda or provide verbal counseling, they are supervisors under the Act.").

### 2.    The Existence of Discipline Guidelines Does Not Demonstrate a Lack of Independent Judgment.

As noted, the Board's Order rests heavily on the existence of policies identifying the level of discipline that should be applied to various kinds of offenses. [Vol. III, Doc. 17-5, pgs. 215-218]. But the Board's determination that the existence of such policies underscores supervisory status is no longer subject to deference; indeed, it was so illogical as to not merit deference even under the *Chevron* regime. Simply put, in an era when employers are subject to innumerable federal, state and local laws regarding employment discrimination,[2] consistency in treating similar situations similarly is critical and is a near-ubiquitous feature of modern human resource practices. To hold that the existence of such policies undercuts a showing of supervisory status is to hold that no one is truly a supervisor. *See, e.g. STP*, 975 F. 3d at 517 (noting that, "[i]n the context of highly regulated industries, such as… nuclear power generation, written protocols are nearly ubiquitous"); *Quinnipiac College*, 256 F.3d at 78.

---

[2] *See, generally* Title VII of the Civil Rights Act of 1964, Age Discrimination in Employment Act, Americans with Disabilities Act, Genetic Information Nondiscrimination Act, Equal Pay Act of 1963, Pregnancy Discrimination Act, Florida Civil Rights Act of 1992, Florida Whistleblower Act, Florida's Pregnant Workers' Fairness Act, workers' compensation laws and countless local ordinances.

This is especially true where, as here, the policies themselves state that they can be deviated from in appropriate circumstances. *Berthold Nursing Care Center,* 351 NLRB 27 at 29 ("[T]he mere existence of company policies does not eliminate independent judgment from decision-making if the policies allow for discretionary choices."). The record simply could not be clearer that Allied Universal's disciplinary policies are merely guidelines. The documents themselves say so. [Vol. III, Doc. 17-4, pgs. 37; Vol. II, Doc. 17-4, pgs. 616-619]. The Lieutenants themselves acknowledged that they have discretion to deviate from the guidelines, and there were specific instances where Lieutenants acknowledged that they did, in fact, deviate from the guidelines. [Vol. II, Doc. 17-4, pgs. 250; pgs. 299-305].[3]

### 3. There Is No Record Support for the Proposition That the Offenses for Which the Lieutenants Issued Discipline Were Easily Discernable.

Perhaps the most obvious example of the mental gymnastics undertaken by the Board is found in the Regional Director's discussion of the kinds of discipline issued by Lieutenants. Notwithstanding the fact that the more than forty disciplines entered into the record dealt with a wide range of violations—a failure to meet

---

[3] Testimony proffered during the hearing regarding three specific disciplinary forms issued by Lieutenants is especially illuminating in this regard. In or around June 2020, three different Lieutenants issued discipline to three different security officers for similar violations – failing to properly conduct fire watch. None of the Lieutenants sought permission from management prior to issuing the discipline. Notably, two of the Lieutenants gave the infraction a Level II discipline, and the other gave it a Level III violation, with the deviating Lieutenant believing a lower level of discipline was warranted due to the policy in question being relatively new. [Vol. I, Doc. 17-2, pgs. 51-67].

grooming standards, a failure to return a key, a failure to check equipment before leaving, returning a weapon with debris and failing to properly clean the weapon, wearing personal earbuds while on duty, a failure to observe a forbidden item from passing through the metal detector, entering a protected area and calling in the area as secure before exiting, failing to notify supervision of lack of relief, crossing a restricted barrier, failure to maintain access of badge, failure to properly inspect a weapon, failure to ID missing round from magazine; a failure to verify a perimeter door was properly secured; being inattentive while on duty, talking on the phone while on duty, leaving a magazine/round of ammunition in a vest after leaving the property, failure to return equipment, failure to identify past due light meter, using abusive language, failure to properly secure a truck lock gate, improper post turnover, failure to follow proper procedures in verifying a visitor properly, using offensive language; and a failure to properly use first rover sheet. [Vol. III, Doc. 17-4, pgs. 111-112].

The Regional Director dismissed this diverse set of violations as involving only "three types of rules infractions" but cited no law for the remarkable proposition that the number of work rules to which employees are subject is relevant to whether their supervisors meet the definition of Section 2(11). [Vol. III, Doc. 17-4, pgs. 16-18].

The Regional Director further glibly asserted, without any effort to explain its reasoning, that "[it] appears" that the violations at issue were "reasonably discernable." Courts of Appeals have rightly criticized the Board where it substitutes "rote" statements and "naked assertions" for reasoned analysis. *Schnurmacher Nursing Home v. NLRB*, 214 F.3d 260, 266 (2d Cir. 2000). Moreover, even if the determination of whether a violation has occurred is an obvious one, the question of how to address the violation is not. And, as discussed above, that latter question is subject to extensive discretion on the part of the Lieutenants.

### 4. The Role of Captains and Higher-Level Management in the Disciplinary Status Does Not Indicate a Lack of Discretion and Independent Judgment by the Lieutenants.

Nor did Captains or the Project Manager overly control Lieutenant's issuance of discipline so as to undercut their supervisory authority. The testimony was undisputed that in the normal instance, Lieutenants are free to issue discipline without input or authorization from higher-level managers. [Vol. III, Doc. 17-4, pgs. 79-80]. Indeed, the Regional Director specifically acknowledged that Lieutenants' issuance of discipline was not subject to independent investigation by their higher-ups. [Vol. III, Doc. 17-4, pg. 154-156].

Rather, the Board focused on purported limits placed on Lieutenants' discretion, in the form of limited directives and occasional after-the-fact oversight imposed on Lieutenants. However, the Board's determination that these dynamics

entirely destroyed Lieutenants' discretion essentially imposed a legal requirement that a supervisor's discretion must be *unfettered* in order to claim supervisory status under Section 2(11). [Vol. III, Doc. 17-4, pg. 41-62]. The Act imposes no such requirement. That a supervisor is dictated to undertake "task A" says nothing about whether, how, and to what extent a supervisor may undertake tasks B, C, D, E and F. Logical fallacies are not entitled to deference. *See, e.g., GGNSC Springfield LLC,* 721 F.3d at 412 ("That advice *sometimes* is provided does not mean that Jones or others do not typically exercise discretion in deciding how to proceed—they do. Indeed, Jones's use of the word *sometimes* demonstrates that it is *not* the norm.).

Similarly, the Board's focus on two instances in which supervisors received "pushback" for a decision or were disciplined for a decision do not destroy supervisory status. [Vol. III, Doc. 17-4, pgs. 41-62; 325-330]. The discretion necessary to be a supervisor under Section 2(11) does not include the discretion to do one's job poorly. Put another way, everyone has a boss, and everyone is subject to performance management and review. However, what is relevant from the perspective of whether the "push back" and discipline cited by the Board destroyed the Lieutenant's discretion is that in neither instance was the Lieutenant's original decision overturned. The original exercise of discretion lay undisturbed. [Vol. III, Doc. 17-4, pgs. 277-281]; *Cf. Transdev Services, Inc. v. NLRB,* 991 F. 3d 889, 899 (8th Cir. 2021) (holding that employees did not possess supervisory status in part

upon conclusion that disciplinary decisions were overruled by upper-level managers).[4]

## IV.    The Board's Cross-Petition for Enforcement Should be Denied.

For the reasons set forth above, the Board's cross-petition for enforcement should be denied.

## <u>CONCLUSION</u>

No reasonable adjudicator could have engaged in a good faith review of the record before the Board and concluded that the Lieutenants at issue in this case are anything other than supervisors under Section 2(11) of the Act. The Lieutenants are responsible for determining when and whether a work rule violation has occurred; they are responsible for determining whether that violation should be addressed via formal discipline or informal counseling; and they are responsible for reviewing all relevant factors, including potential mitigating factors, and determining the appropriate level of discipline to issue. They exercise their own independent

---

[4] The testimonial colloquy and documentary evidence referenced in Footnote 3, above, is relevant to this point, as well. In each instance, the Union representing the security officers pushed back on the discipline, on the grounds that the policy was relatively new and not understood by the officers. In each instance, the Project Manager consulted with the Lieutenants over whether to keep the discipline in place, putting forth reasons why the discipline might be rescinded or reduced. In each instance, the Lieutenant stood by the original discipline, giving reasons – with each one giving noticeably different reasons – as to why the discipline should remain in effect. Vol. I. Doc. 17-2, pgs. 53-68; Vol. II, Doc. 17-3, pgs. 125-129; 164-166; 191-192]. Rather than treating this as clear evidence that the issuance of discipline was up to the supervisors, the Regional Director turned the documents on their head, somehow concluding that the documents demonstrated excessive control or influence over the disciplinary process so as to undermine the Lieutenant's discretion. [Vol. III, Doc. 17-4, pgs. 41-62]. The evidence does nothing of the sort, and that the Regional Director and the Board would so contort it demonstrates that their determination was a post-hoc rationalization of a predetermined result, not reasoned and impartial factfinding.

judgment in performing these tasks, and they do so largely unbound by written instructions or policies or by control by their own managers. The written instructions and managerial oversight that do exist reflect nothing more than the realities of a workplace and an intact chain of command. Regional Director and later the full Board's conclusion that Lieutenants are not supervisors is not entitled to deference and is unsupported by the record. The Board's Order must be set aside and not enforced.

Dated August 28, 2024                    Respectfully submitted,


**MARTENSON, HASBROUCK & SIMON LLP**

*/s/ Matthew D. Crawford*
Matthew D. Crawford
Georgia Bar No. 190109
Jennifer L. Pope (PHV)
Martenson Hasbrouck & Simon LLP
2573 Apple Valley Road NE
Atlanta, GA 30319
Tel: (404) 909-8101
mcrawford@martensonlaw.com
Jpope@martensonlaw.com

*Counsel for Petitioner/Cross-Respondent*
*Universal Protection Services, LLC d/b/a*
*Allied Universal Security Services*

## <u>CERTIFICATE OF COMPLIANCE</u>

1. This Brief complies with the type-volume limitation of Fed. R. App. P. 37(a)(7)(B) because it contains less than 13,000 words, excluding the parts of the Brief exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4.

2. This Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman type.

August 28, 2024.

*/s/ Matthew D. Crawford*
Matthew D. Crawford

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 28, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit using the appellate CM/ECF system and via U.S. Mail, and I certify that all participants in this case are registered CM/ECF users.

*/s/ Matthew D. Crawford*